Gilbert WU, Plaintiff,

v.

SOUTHEAST–ATLANTIC BEVERAGE CORPORATION, Defendant.

No. CIV.A. 1:02–CV–505–CAP.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 23, 2004.

**1320**

Kevin Hayden Theriot, Office of Kevin H. Theriot, Olathe, KS, for Plaintiff.

Margaret Hutchins Campbell, Ogletree Deakins Nash Smoak & Stewart, Atlanta, GA, Heather A. Owen, Mary W. Jarrett, Coffman Coleman Andrews & Grogan, Jacksonville, FL, for Defendant.

### ORDER

PANNELL, District Judge.

On August 13, 2003, Magistrate Judge Gerrilyn G. Brill entered a final report and recommendation in the present matter granting the defendant's motion for summary judgment. The magistrate judge's final report and recommendation was subsequently adopted by this court on September 12, 2003, and judgment was entered against the plaintiff. However, the plaintiff filed a motion to amend or alter the judgment entered against him, claiming that neither the plaintiff's counsel nor the plaintiff himself ever received a copy of the final report and recommendation and, thus, the plaintiff was not afforded the opportunity to submit objections to the report pursuant to 28 U.S.C. § 636(b)(1). Accordingly, in an order dated December 16, 2003, the court vacated its previous order and granted the plaintiff ten days in which to file his objections. The plaintiff filed his objections on December 31, 2003.

However, after carefully considering the report and recommendation of the magistrate judge [Doc. No. 42–1] and the objections thereto, together with the record as a whole, the court concludes that its initial ruling in this matter was correct. As such, the court now receives the magistrate judge's report and recommendation with approval and adopts it as the opinion and order of this court.

The granting of the defendant's motion for summary judgment disposes of all issues pending in this case. Accordingly, the clerk may issue judgment in favor of the defendant and against the plaintiff.

### FINAL REPORT AND RECOMMENDATION AND ORDER

BRILL, United States Magistrate Judge.

Plaintiff Gilbert Wu filed this employment discrimination action against his former employer, Southeast–Atlantic Beverage Corporation, on February 22, 2002. Plaintiff alleges that defendant discriminated against him because of his race (Asian) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981 (" § 1981"). Plaintiff also claims that defendant retaliated against him for his complaint about race discrimination, in violation of Title VII, and interfered with rights protected by the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

This action is currently before the court on defendant's Motion for Summary Judgment [Doc. 29] and the following non-dispositive motions: plaintiff's Motion to Extend Discovery [Doc. 15], defendant's Motion to Compel [Doc. 16], plain-

tiff's Motion to Compel [Doc. 18], and defendant's Unopposed Motion to Extend Time to File Motion for Summary Judgment and to Extend Page Limitation [Doc. 19]. For reasons stated below, the undersigned **RECOMMENDS** that defendant's Motion for Summary Judgment [Doc. 29] be **GRANTED**. For good cause shown, defendant's Unopposed Motion to Extend Time [Doc. 19] is **GRANTED nunc pro tunc**. Given the recommendation that this action be dismissed, the remaining motions [Docs. 15, 16, and 18] are **DENIED as moot**.

## I. *FACTS*[1]

Defendant is a franchise bottler, manufacturer, and distributor of beverage products in Florida and Georgia. Defendant's parent company is Dr. Pepper/Seven Up ("DPSU"). Plaintiff was hired by defendant on May 13, 1985 as a Sales Representative. His duties included (1) personally visiting with customers in his territory; (2) meeting with the store manager or the person in charge of ordering beverage products to verify the order and to attempt additional sales, (Doc. 35, Wu Decl. ¶ 10); (3) checking the inventory of defendant's products on the store shelves and in the store's backroom; (4) organizing the product on the shelves, including restocking and rotating the product so that older product is in the front; (5) removing expired product from the shelves; (6) verifying correct price on the product display; (7) cleaning the display shelves; (8) preparing beverage orders and submitting them to defendant.

In November 1998, plaintiff was promoted to the position of Sales Supervisor. In this position, plaintiff supervised Sales Representatives and drivers who serviced his assigned territory. Plaintiff was hesitant to accept this promotion, and he complained that he made almost 29 percent less as a Sales Supervisor than he had made as a Sales Representative. At some point, plaintiff asked his supervisor if he could return to his former position. This request was apparently denied.

On September 27, 1999, defendant hired Tom Newlon as the General Sales Manager for its Atlanta branch, thereby making him plaintiff's immediate supervisor. Newlon never made any racially offensive comments to plaintiff or in plaintiff's presence.

### A. *Newlon Denies Plaintiff's Vacation Request*

Prior to December 31, 1999, Newlon issued a form to the Atlanta sales staff to be used for 2000 vacation requests. The form states:

> All Personal Time Must Be Submitted with at least 2 weeks notice. A schedule will be posted after Jan. 4, 2000. You may be asked to reschedule d[ue] to a conflict with another employee. We permit one employee off per week, and if a conflict occurs the senior employee gets first choice. After the 4th of January vacation will be handled on a first come, first serve basis.
>
> *   *   *   *   *   *
>
> Please Return to supervisor no later than *December 31, 1999.*

(Wu Dep., Exh. 5)(emphasis in original). Newlon, who had prepared this form, stated that he implemented this policy to avoid insufficient coverage within each of the sales territories. He borrowed the language from a collective bargaining agree-

---

**1.** Unless otherwise indicated by citation to the record, the facts stated herein are taken from the uncontested portions of defendant's Statement of Undisputed Material Facts. (*Com-* *pare* Doc. 29 at 4, *et seq., with* Doc. 34, Attach.). Contested facts are presented in a light most favorable to the plaintiff.

ment with defendant's drivers. The term "conflict" in the policy refers to situations in which two employees within the same rank and in the same territory request the same day off. "Seniority" refers to the length of employment with the company.

During the relevant time period, Jeff Doran, a Caucasian Reset Supervisor (also known as a Reset Manager or Merchandising Supervisor) worked in plaintiff's territory. A Reset Supervisor is responsible for all resets in a specific territory. (Newlon Dep. at 12–13, 15–16). Doran, like all other Reset Supervisors, reported directly to Newlon, not to the Sales Supervisor for his territory. (*Id.* at 11–12, 16, 20–21; Doc. 29, Perna Aff. at 2, Exh. B; Newlon Aff. at 2). Doran's job description states that he is a manager and that his immediate supervisor is the General Sales Manager, who at the time was Newlon. (Perna Aff. at 2, Exh. B; Newlon Dep. at 5, 11–12). Plaintiff also reported directly to Newlon. (*See* Perna Aff. at 2, Exh. C). In contrast, the Sales Representatives' job description states that they are to report directly to their Sales Supervisors. (*Id.* at 2, Exh. A). Newlon completed performance reviews for Reset Supervisors, whereas performance reviews for Sales Representatives were completed by their Sales Supervisors. (*See* Wu Dep. at 43, 206–97, Exh. 20; Newlon Dep. at 20–21, 49, Exh. 44; Newlon Aff. at 2, Exhs. B and C; Perna Aff. at 2). Finally, Reset Supervisors and Sales Supervisors submitted vacation requests to Newlon; Sales Representatives submitted their requests to their Sales Supervisors, who reviewed them and passed them onto Newlon for final approval. (*See* Anthony Dep. at 115–16).

Sometime after January 4, 2000, Doran and plaintiff both submitted vacation requests to Newlon for the week of April 3 through April 7, 2000; Doran's request was submitted before plaintiff's. Newlon denied plaintiff's request and granted Do-

ran's. Newlon states that he made this decision because Doran had submitted his first. Even if Doran had not submitted his request first, Newlon would have granted it because Doran, having been hired three years before plaintiff, had greater seniority. (Newlon Aff. at 3). Plaintiff protested Newlon's decision to both Newlon and Newlon's boss, Bill Theiss. Plaintiff's appeal to Theiss was denied.

Plaintiff contends that his request should have been granted because, as a Reset Supervisor within plaintiff's territory, Doran was plaintiff's subordinate. (Wu Dep. at 42, 77). Plaintiff relies, in part, on a document issued by defendant entitled, "New Restructure and Manager Assignments." (Wu Dep. at 82; Newlon Dep., Exh. 42). That document includes a list of Sales Supervisors, with each name followed by a list of employees. The list following plaintiff's name includes Doran. (Newlon Dep., Exh. 42). Another Sales Supervisor, Rod Anthony, testified that he gave instructions to the Reset Supervisor within his territory. (Anthony Dep. at 114–15).

Plaintiff acknowledges that it would not be appropriate for both himself and the Reset Supervisor for his territory to be on vacation at the same time. (Wu Dep. at 41). Doran, unlike other employees in plaintiff's territory, could cover plaintiff's duties in plaintiff's absence and *vice versa.* To allow plaintiff and Doran to go on vacation during at the same time would defeat the purpose of the vacation policy because no supervisor would be left in the territory to cover either of their duties. (Newlon Aff. at 2–3). Coverage by a supervisor from another territory, Newlon testified, would be problematic because of lack of familiarity with the territory. (*Id.* at 3).

According to plaintiff, he and Doran approached Newlon together regarding the

vacation conflict. (Wu Dep. at 40–41). During their conversation with Newlon, Newlon initially stated that plaintiff had "precedence" over Doran. (*Id.* at 41). Plaintiff understood this to mean that he would be given the requested vacation time because he was a higher-level manager. (*Id.* at 45, 77). Plaintiff, however, continued the conversation with Newlon, in the hope that both he and Doran would be able to take vacation at the same time. (*See id.* at 43–44, 46). At some point Doran departed, and after a lengthy conversation between just plaintiff and Newlon, Newlon changed his mind and stated, "we are just going to go by this form here, first-come, first-serve." (*Id.* at 46).

## B. *Plaintiff Takes Sick Leave While Doran is On Vacation*

On April 4, 2000, one of the first days for which plaintiff had requested vacation, plaintiff sought time off from work because of back pain. After being treated by his doctor on that day, plaintiff faxed a doctor's note to Newlon indicating that he needed to be out of work from April 4 through April 10. (Wu Dep., Exh. 2). The note did not state a reason for plaintiff's absence, or provide any information regarding his condition. (*Id.*). Plaintiff also left a voice-mail message for Newlon on April 4, stating that he would be absent until April 10 due to his back condition. Plaintiff did not provide Newlon with any additional information in his message regarding his absence or the needs of his territory during his absence. (Newlon at 3).

According to Newlon, employees were expected to speak directly with their supervisors before obtaining approval for an absence so that the supervisor could ensure that the needs of that employee's territory were covered. (*See* Newlon Dep. at 76–77; Newlon Aff. at 3–4; Wu Dep., Exh. 10). At this time, plaintiff supervised approximately eight Sales Representatives

and drivers in a large territory of Atlanta. Plaintiff made no attempt to contact Newlon after leaving the voice-mail message. (*See* Wu Dep. at 19, 48–50; Newlon Dep. at 73–75). Although Newlon was out of the office on April 4, 2000, he could have been reached by cell phone, the number for which was made available to plaintiff and other employees. (*See* Newlon Dep. at 74–76).

The only individual plaintiff spoke to directly regarding his absence was Sam Frazier, a fellow Sales Supervisor. Frazier had no supervisory authority over plaintiff. Frazier told plaintiff during their telephone conversation to fax his doctor's excuse to Newlon. (Wu Dep. at 64). According to plaintiff, Frazier had been left in charge while Newlon was out of town. (Wu Dep. at 62). Newlon had left a message on his voice mail stating that Frazier should be contacted if the caller was in need of immediate assistance. (Newlon Dep. at 79–80, Exh. 46).

Plaintiff did not advise any of his subordinate employees that he would be absent. (Wu Dep. at 65). He did not change the message on his answering machine to indicate that he would be out, and he did not check his messages or give anyone else access to his voice mail so that callers could receive an immediate response. (Wu Dep. at 61–62; Newlon Aff. at 4). Although Newlon expected plaintiff to perform these tasks, he admitted that plaintiff did not violate any written work rules in failing to do so. (*See* Newlon Dep. at 80–83).

According to plaintiff, he advised Frazier of all customer issues of which he was aware on April 4, including information about delivery complaints he had received and two grand openings scheduled during his anticipated absence. (Wu Dep. at 61–64). Newlon believed that plaintiff merely told Frazier to "stop by" a grand opening

and that he failed to advise Frazier that preparations for the grand opening had not been completed. (*See* Newlon Dep. at 71–72, 90–95, Exh. 46). According to Newlon, a client's grand opening is "not an everyday event" and arrangements should be made well in advance. (*Id.* at 93–94). Because plaintiff had not made prior arrangements, last minute arrangements had to be made in his absence to staff and stock the store sufficiently. (*See id.* at 71–73, 91–95, Exh. 46). One month prior to this incident, plaintiff had failed to schedule appropriate coverage for the opening of another client's store, which almost cost defendant the account. (*Id.* at 71–72, Exh. 46 at 3).

Newlon also learned during plaintiff's absence that some customers were unaware that plaintiff was their Sales Supervisor even though plaintiff had been covering his district for almost a year and a half. (Newlon Dep. at 71–72, Exh. 46 at 2; Wu Dep. at 124). Another Sales Supervisor testified, however, that, with so many clients for each Sales Representative, it was virtually impossible to know all of the store managers. (O'Kelley Dep. at 83). A store manager, Austin Mutua, also testified that he never knew who the Sales Supervisor for his district was. (Mutua Dep. at 45).

During plaintiff's absence, Newlon received a telephone call from a customer in plaintiff's territory complaining that he had called for three consecutive weeks trying to get service or the attention of a supervisor, but had not received a response. (Newlon Dep. at 71–72, Exh. 46 at 2). Newlon also received a telephone call from one of defendant's employees informing him that plaintiff had not handled a specific matter Newlon had been asking plaintiff to handle since February 2000. (*Id.*).

Newlon attempted to contact plaintiff by telephone two-to-three times per day during plaintiff's absence to determine the status of plaintiff's health and to address the needs of plaintiff's territory. Newlon left several messages on plaintiff's home and office answering machines, including two messages on April 5, in which he asked plaintiff to call him for verification of his situation and to discuss the needs of his territory. Plaintiff did not answer or return any of Newlon's telephone calls until April 9 or 10.

On April 7, Newlon, Theiss, and Frazier drove to plaintiff's house in an attempt to contact him, but no one answered the door, and it did not appear to them that anyone was home.

On April 5, plaintiff took an approximately eight-hour bus trip to join his wife and children at their vacation time-share, located at an ocean-front resort in Daytona Beach, Florida, and they traveled home on April 8. (Wu Dep. at 17–19). Plaintiff's doctor had prescribed strong medication and had advised plaintiff not to take it while alone. (*See* Doc. 35, Elsbree Decl. ¶ 8). Because plaintiff's family had traveled to Daytona Beach the weekend before, plaintiff had no choice but to join them there or force his wife to return. (*See* Wu Dep. at 18). While there, he "basically stayed in bed the entire time." (*Id.*).

### C.  *Newlon Demotes Plaintiff*

On April 10, 2000, Newlon held a meeting with plaintiff and Theiss, at which he demoted plaintiff to Sales Representative. During the meeting, plaintiff stated or implied that he had not answered the telephone or Newlon's knocks because he was asleep or too medicated to do so. (Wu Dep. at 49–50). At the time, Newlon and Director of Human Resources Tony Perna suspected that plaintiff had gone on vacation instead of being out sick as he claimed, but they could not prove it. (Doc.

29, Perna Aff. at 2–3; Newlon Aff. at 4–5). Their suspicion about his whereabouts was one reason for his demotion. (*Id.*). The documented reasons provided to plaintiff include (1) plaintiff's failure to contact his supervisor directly regarding his absence; (2) failure to return telephone calls or to check his messages; (3) failure to let his superiors, customers, peers, and subordinates know what was going on in his territory, or to give them another point of contract during his absence; (4) failure to handle a second grand opening appropriately; and (5) failure to address shortcomings noted in his November 1999 performance review. (Newlon Dep. at 71–72, 91–96, Exh. 46).

On April 16, 2000, plaintiff protested his demotion in writing to Perna. (Wu Dep. at 65–66, Exh. 8). Perna investigated plaintiff's complaint and concluded that it was without merit. (Perna Dep. at 17–20). Perna found it hard to believe that plaintiff was so incapacitated, as he claimed, that he could not return one telephone call during the entire week, especially when his supervisors had gone to the house, banged on the door, and looked in the window. (*Id.* at 19–20).

### D. *Plaintiff Loses Accounts*

In 1999, defendant began a comprehensive reorganization of its sales territories to separate out "bulk routes" from the existing "conventional routes" in order to better compete with Coke and Pepsi. This reorganization began while plaintiff was still a supervisor and continued after his demotion. Under the conventional route system, Sales Representatives were responsible for both high and low volume stores. They would visit the stores as needed and place orders for the store, after which the product would be delivered by a conventional bay truck. Both the truck driver and the Sales Representative would merchandise the store during their respective visits. In contrast, bulk routes involved only high volume stores, and deliveries were made by tractor-trailer.

In August 2000, six large accounts were removed from plaintiff's territory and added to a bulk route. Another eight were removed in January 2001. These route cuts were part of the company-wide restructuring. (Wu Dep. at 135–36).

Whether a store was switched to a bulk route required consideration of a number of factors, including store volume and location. Bulk supervisors Travis McCord and Joe Bachman were responsible for making these determinations, which were then sent to Regional Manager Larry Harbour for final approval. Newlon was not involved in the decisionmaking process.

The transfer of accounts to bulk routes occurred in stages. The first wave came in 1999, when several very large stores were transferred. In August 2000, large Kroger, QuikTrip, Publix, and Cub Food stores were transferred to bulk routes. In January 2001, defendant added some additional stores to the bulk routes after examining the remaining large-volume stores. In 1999, approximately 24 accounts had been assigned to bulk routes. After the January 2001 transfers, this number increased to 120 to 130 accounts.

All Sales Representatives lost accounts during this process, some more than others. Some Sales Representatives were transferred to bulk routes. As a result, the smaller stores were distributed among fewer conventional Sales Representatives. Some effort was made to distribute the conventional stores more equitably during the transition. Furthermore, some stores which had been placed in a bulk route were returned to conventional routes during the transition. Two or three of these accounts were given to plaintiff, including two very large accounts. Sales Representatives also had an opportunity to make up for their lost accounts by using the addi-

tional time they had to obtain new customers.

At least one other Sales Representative, Steve Spurley, who is not Asian–American, was as adversely affected as plaintiff by this reorganization. They both complained to management. Another non-Asian Sales Representative, John Valdo, also lost many large accounts, including five QuikTrips.

### E. *Plaintiff's Performance as a Sales Representative*

After plaintiff was demoted to Sales Representative, his supervisors received numerous complaints from his customers regarding service at their stores; these included complaints about the Sales Representative failing to visit with the managers and failing to order product. (O'Kelley Dep. at 22, 24, 77, 106–08; *see also* Anthony Dep. at 7–8, 11, 17, 20–21, 122–23). On June 28, 2000, plaintiff received a corrective action notice from his immediate supervisor, Steve Rodriquez, stating, "managers do not know who Gilbert Wu is" and instructing plaintiff to "re-introduce yourself with store management, improve communications immediately, clean shelves." (Perna Aff. at 4, Exh. E; Wu Dep. at 14–15, Exh. 1 at 458–59; Anthony Dep. at 20–21). Plaintiff was given two weeks to improve his job performance. (Perna Aff. at 4, Exh. E). Plaintiff contends that any problems with his accounts during this time period were due to delivery problems, which were not under his control. (Wu Dep. at 203).

In August 2000, plaintiff received his annual review by Rodriquez, who advised plaintiff that he needed to communicate better with store managers and that he must follow-up with customers who had experienced delivery problems. (Wu Dep. at 206–07, Exh. 20).

Shortly after this review, Doug O'Kelley, a white man, became plaintiff's immediate supervisor. O'Kelley continued to supervise plaintiff until February 2001.

### F. *Plaintiff Files an EEOC Charge*

On October 5, 2000, plaintiff filed a charge of race discrimination against defendant with the Equal Employment Opportunity Commission ("EEOC"). Newlon told O'Kelley about this charge in October 2000. (O'Kelley Dep. at 81). When asked if Newlon ever encouraged him to fire plaintiff, O'Kelley testified, "I seem to think that he was heading into that direction, yes." (O'Kelley Dep. at 74). Newlon made similar comments about wanting to fire two other Sales Representatives, Ron Thrash and Steve Spurley, neither of whom is Asian–American. (*Id.* at 11–12, 74). The record also contains no evidence that Thrash or Spurley filed an EEOC charge against defendant.

Sales Supervisor Alex Belete avers that during October 2000 he was in O'Kelley's office when Newlon told O'Kelley, "Gilbert Wu is making trouble because he filed a suit with the EEOC ... he wanted to 'kick Gilbert's ass out. I don't want to talk to him. I don't want to see him. Just deal with him.'" (Doc. 35, Belete Decl. ¶¶ 10–11). O'Kelley later told Belete that "the company was digging a hole for Mr. Wu because he was making trouble and that I was going to take his place after Mr. Wu was no longer an employee." (*Id.* at ¶ 12).

### G. *Plaintiff's Performance After Filing EEOC Charge*

In the months following plaintiff's performance review by Rodriquez and plaintiff's EEOC charge, plaintiff did not meet or communicate with all of his store managers, and even avoided talking to some managers. (*See* Wu Dep. at 227–29, 236–38). He avoided managers when they were experiencing repeated delivery problems, which, according to Newlon, is when

customer contact becomes very important for maintenance of good customer relations. (*Id.* at 228–29, 236–38, Exh. 1 pp. 472, 548; Newlon Aff. at 6).

Plaintiff blames a significant number of the complaints from his customers on delivery problems. Defendant concedes that, during the summer and early fall of 2000, it experienced significant delivery problems, but contends that the situation was improving starting approximately Labor Day 2000. (Newlon Dep. at 115, 193–94; *see also* Anthony Dep. at 17–18). Plaintiff presents evidence tending to show that defendant continued to experience delivery problems well after this date. (*See* Doc. 35, Wu Aff. ¶ 11; O'Kelley Dep. at 39–40, 89–90; Doc. 35, Belete Aff. ¶ 13; Anthony Dep. at 191–92).

From September 2000 through February 2001, O'Kelley placed the following documentation concerning complaints or problems with plaintiff's accounts in a file he maintained in his office:

1. A September 26, 2000 invoice for Walgreens # 5898 with a handwritten notation, "Refused entirely much too much overstock."

2. A handwritten note dated October 31, 2000 by O'Kelley documenting a complaint by Eckerd's Drugs # 260 that the store had "no service," meaning that plaintiff had not serviced the account.

3. A handwritten note dated November 7, 2000 by O'Kelley stating that plaintiff had missed the 4:30 p.m. order cut-off, which can cause delivery problems.

4. A handwritten note dated November 13, 2000 by O'Kelley that Publix at Five Fork's Trickem had its display pulled and 30 cases of product moved from the display to storage.

5. A December 12, 2000 invoice for Speedway # 11 with a handwritten notation, "Refused order salesman did not see manager."

6. An e-mail sent to Newlon on January 2, 2001 indicating that two Speedway stores had telephoned defendant to complain they had not had 12–packs for several weeks and that one store's display was empty.

7. A handwritten noted dated January 3, 2001 by O'Kelley documenting a complaint by B.P. Oil that the store had not received service since December 14, 2001.

8. A handwritten note by O'Kelley documenting a complaint on January 5, 2001 by Manager George McNair of Kroger # 484 that plaintiff had not stocked the shelves from backstock and that backstock was low.

9. A handwritten noted dated January 8, 2001 by O'Kelley documenting two complaints: one from Kroger # 394 stating that it had run out of two of defendant's products, and a second from B.P. Amoco # 24124.

10. A handwritten noted dated January 17, 2001 by O'Kelley documenting a complaint from Debbie at QuikTrip # 751 about not having an order and a complaint from QuikTrip # 748 that it had not seen anyone in two weeks.

11. A handwritten note dated February 3, 2001 by O'Kelley documenting a call from Walgreens on Highway 29 that it was out of 12–packs while the store was having a sale and that plaintiff had sent in an order that did not include additional 12–packs.

(O'Kelley Dep. at 47–66, Exhs. 9–20).

Plaintiff admits that these documents were placed in his file, but denies their accuracy. Plaintiff was not told about these complaints and was not aware of

them until after this lawsuit was filed. (Doc. 35, Wu Aff. ¶ 20). Prior to October 27, 2000, only two documents reflecting customer complaints were placed in plaintiff's file during 14 years of service for defendant. (Newlon Dep. at 96–106; Wu Aff. ¶ 7).

O'Kelley testified that he also received complaints about other Sales Representatives. (O'Kelley Dep. at 28, 66, 76–77). He kept notes regarding plaintiff "because I knew Gilbert was going to sue . . . ." (Id.). O'Kelley formed this opinion after plaintiff "brought a file in . . . one day and had all of this stuff wrote down about all the missed deliveries and everything. And it just struck me as odd that somebody would go through that great detail to do that and I felt like at the time once I saw that and what he was doing then I pretty much knew in my mind. And I even said it to Tom [Newlon] that he would file a suit. I said he's not stupid. He's building a case." (Id. at 81; see also id. at 29). When asked if Newlon had instructed him to keep notes on plaintiff because of the EEOC charge, O'Kelley testified, "He may have. But, you know, I would have done it anyway because of it, because I knew what he was trying to do or I felt like I knew what he was going to do. I also know [Newlon] couldn't fire him as long as that suit was in place." (O'Kelley Dep. at 87).

In O'Kelley's opinion, plaintiff "was a little shy and timid" in his work; "[h]e kind of backed into the account instead of walking in and asking for the order." (O'Kelley Dep. at 23). Some of plaintiff's stores were in good condition, others were not. (Id. at 22–23). The lower volume stores tended to be problematic for plaintiff. (Id. at 24).

On February 3, 2001, O'Kelley issued plaintiff a verbal warning as a result of the Highway 29 Walgreens' complaint. (See Anthony Dep. at 132–33). Plaintiff contends that he was merely following the instructions of the store manager. (Wu Dep. at 269). After receiving the verbal warning, plaintiff personally took 12–packs to the store. Sales Supervisor Rod Anthony was in the warehouse when plaintiff came to pick up the product. (Anthony Dep. at 133–35). Anthony personally checked plaintiff's order and the delivery ticket and verified that plaintiff had not ordered 12–packs. (Id. at 135).

Shortly after the Highway 29 Walgreens incident, O'Kelley was transferred and Anthony, a black man, became plaintiff's immediate supervisor. Anthony received calls from customers complaining about all of the Sales Representatives in his territory, but the calls with respect to two individuals—plaintiff and Alex Belete (a non-Asian Sales Representative)—were much more numerous. (Anthony Dep. at 11, 122–23; see also id. at 7–8, 17). Anthony estimated that he received between six and seven calls daily from customers complaining about plaintiff or Belete. (Id. at 123).

### H. Plaintiff is Suspended by Anthony

After Anthony began receiving complaints about plaintiff, he reviewed O'Kelley's file, which included the handwritten documentation of customer complaints, and discovered that Rodriquez had issued a written corrective action to plaintiff in June 2000. (Anthony Dep. at 20–21).

On March 2, 2001, the store manager at Walgreens # 5446, a customer of plaintiff's, complained directly to defendant's parent company, DPSU, that defendant had not been prepared for a national sale of DPSU's product at Walgreens and that store # 5446 had been out of product twice during the sale. (Anthony Dep. at 27–28, Exh. 3). He also complained that no one had connected with him to take orders, nor had they returned his telephone calls. (Id., Exh. 3). This was the only complaint defendant received from Walgreens stores

during this sale. (*Id.* at 27; Doc. 29, Newlon Aff. at 6). Because this complaint had gone directly to DPSU, it was taken very seriously by defendant. (Newlon Aff. at 6). Anthony was advised of this complaint on or about March 7, 2001. (*See* Anthony Dep. at 26–28, Exh. 3).

According to plaintiff, he followed the store manager's instructions with respect to ordering product for the sale. (Wu Dep. at 282–83). When he went to Walgreens # 5446, the manager was busy unloading a truck and plaintiff did not want to interrupt him. (Wu Dep. at 197). Instead of waiting for an opportunity to speak directly to the manager, plaintiff ordered for the store based on what the manager had ordered the previous week. (*Id.*). Plaintiff believed that, because the manager waved at him, he could have come to plaintiff if he needed to bring anything to plaintiff's attention. (*Id.* at 197–98).

After learning of the complaint to DPSU, Anthony decided to suspend plaintiff for three days. (Anthony Dep. at 22, 28–31, Exh. 1). Anthony alone made this decision. (*Id.* at 34–35; *see also id.* at 165–66). He wanted "to open [plaintiff's] eyes to the severity of the problems that he was creating out in his territory, with this being the second time in a month for these Walgreen's [sic] locations to be out of product ...." (*Id.* at 31). Anthony instructed plaintiff to take "ownership of his accounts on a daily basis ...." (*Id.*, Exh. 1).

Anthony met with plaintiff on March 12, 2001 to advise him of the suspension. (Anthony Dep. at 34). At that time, plaintiff told Anthony about the charge of discrimination he had filed with the EEOC. (*Id.* at 11–12, 61, 113). According to Anthony,

this was the first he had heard of the charge. (*Id.*). Plaintiff disputes this, but has no evidence supporting his theory other than his own speculation that Newlon, who had told O'Kelley, must have also told Anthony. (*See* Wu Dep. at 190–93; Doc. 34, Pla. Resp. to Def. Stm. of Undisputed Facts ¶ 87). Plaintiff also told Anthony of his suspicion that Newlon was using Anthony to discriminate or retaliate against plaintiff. (Wu Dep. at 190–93; Anthony Dep. at 12, 61–62). In response, Anthony told plaintiff that he did not care about the past, and that this meeting was about plaintiff's problems in his territory at the present time. (Anthony Dep. at 12, 113).

### I. *Problems Discovered During Plaintiff's Suspension*

During plaintiff's suspension, Anthony asked Rodriquez to help him cover plaintiff's duties so that they could meet with some of the managers in plaintiff's territories and personally view the condition of plaintiff's stores. (Anthony Dep. at 37–38, 166, 183–86). Anthony made the decision to conduct this investigation; he was not instructed to do so by Newlon. (*See id.* at 166–67, 186–87).

▮ Rodriquez reported back to Anthony the following with regard to plaintiff's accounts: [2]

1. At Speedway # 21, the manager complained of inconsistent service. According to Anthony, he also personally spoke to the manager who complained that he could not get any follow-up from the Sales Representative. (Anthony Dep. at 171–72).

2. Employees at the Killian Hills Texaco complained that they had not seen the salesman, that the sales-

---

**2.** Plaintiff contends that this evidence constitutes inadmissible hearsay. This evidence is not admitted for the truth of the matters asserted therein, but merely to demonstrate Anthony's state of mind with regard to plaintiff's job performance. Accordingly, the evidence does not constitute hearsay.

man does not work the product in the cooler, and that the salesman is lazy and does not show up on a regular basis.

3. Employees at Satellite Foods had not seen a salesman in three months.

4. Employees at Speedway # 11 complained that the two-liter rack was empty and that they had not seen a salesman. The manager of this store, however, states that he had no problems communicating or meeting with plaintiff. (Mutua Dep. at 40–44, Exh. 1).

5. The manager at the K & Y Quick Mart complained that the salesman did not come on a regular basis; for this reason, he purchased one of defendant's products from a different distributor.

(Anthony Dep. at 171–85, Exh. 4, 9). During plaintiff's suspension and Anthony's investigation, Anthony personally learned of the following complaints and problems with plaintiff's stores:

1. At the Winn–Dixie on Beaver Ruin, the manager complained of inconsistent service and that he had received orders only once a month, rather than once a week. (Anthony Dep. at 54–55, Exh. 5). Anthony specifically asked the manager if the problem was with deliveries or with plaintiff's ordering. (Id. at 54–55). The manager stated that the delivery driver was excellent and always took care of him; it was the Sales Representative he did not see. (Id.). Anthony personally visited the store and found its condition to be "horrendous." (Id. at 56). The shelves were almost empty, requiring him to rearrange the remaining bottles to cover up the holes. (Id. at 56–57). Plaintiff contends that any problems with this store were due to missed deliveries. (Doc. 35, Wu Aff. ¶ 11).

2. Store manager David Pryor at Winn–Dixie # 1990 also complained of inconsistent service. (Anthony Dep. at 180–81, Exh. 9). He told Anthony that the problem was with the Sales Representative, not with deliveries. (Id. at 180–81). He stated that the delivery driver did a good job, straightened the product, and made it nice and neat. (Id. at 181). When Anthony asked if Pryor had spoken to the salesman about the problem, Pryor responded, "Who's the salesman?" (Id. at 180–81). Anthony also personally observed that the shelves were empty and "a mess" in this store. (Id. at 180). Plaintiff contends that any problems with this store were due to missed deliveries. (Wu Aff. ¶ 11).

3. When Anthony visited Publix # 89, he found the store completely out of defendant's product. (Anthony Dep. at 38–41, 160–61). The store was also out of backstock and the shelves were "filthy." (Id. at 38, 52). Anthony then met with the store's assistant manager, Ms. Echols, whose first words to Anthony were, "You don't want to see me." (Id. at 39). When Anthony introduced himself and asked what he could do to fix the problem, she advised that the empty shelves were a consistent problem since plaintiff had become the Sales Representative and that plaintiff did not communicate with the manager. (Anthony Dep. at 39, 53, 82, 161; see also id., Exhs. 5 and 11). Echols was angry and asked for a new Sales Representative. (Id. at 39, 52–53, Exh. 5). She stated that if she did not receive a new Sales Representative, defendant would never have another display in

her store and might lose some of its shelf space. (*Id.* at 39). To counter this evidence, plaintiff presents a letter written by the Grocery Manager at Publix # 89, Zack Pierce, who wrote that service had been good; "the problem that we have found is we are not getting enough deliveries to cover our business needs. I have no problem with the representative." (Wu Dep. at 343, Exh. 37; Doc. 35, Wu Decl. ¶¶ 11–12).

According to Anthony, plaintiff did not complain to him about delivery problems at his stores. (Anthony Dep. at 40, 191). He had no knowledge, for example, of delivery problems at Publix # 89 prior to his visit. (*Id.* at 40). He further testified that, as a Sales Representative, plaintiff should have reported consistent problems with deliveries to his superiors. (*Id.*). Plaintiff, in contrast, avers that he had delivery problems throughout his tenure as a Sales Representative and that he "made these problems known to all of [his] managers, including Rod Anthony, either in writing or verbally." (Doc. 35, Wu Decl. ¶ 11). The record contains evidence that plaintiff complained *in writing* about delivery problems on 13 occasions between July 13, 2000 and September 22, 2000, and that he complained again in writing on January 16, 2001. (Wu Dep. at 321–22, Exh. 35; *see also* Newlon Dep. at 192–93, Exh. 58). There is no evidence that plaintiff complained *in writing* about delivery problems while Anthony was his supervisor. (*See* Wu Dep. at 326–32).

### J. *Plaintiff is Terminated*

Upon plaintiff's return to work after his suspension, Anthony held a meeting with plaintiff and Newlon. The purpose of the meeting, according to Anthony, was to figure out a way to fix the problems in plaintiff's territory. (*See* Anthony Dep. at 43–44; Newlon Dep. at 168). Anthony did not intend to terminate plaintiff based solely on the complaints he had received; he wanted to give plaintiff an opportunity to respond. (*See* Anthony Dep. at 43; Newlon Dep. at 167–68). Anthony, Newlon, and Newlon's supervisor had discussed the possibility of terminating plaintiff prior to the meeting if his responses were not satisfactory, but they did not make a decision at that time. (*See* Newlon Dep. at 167–68).

At the meeting, Anthony went through each of the complaints and asked plaintiff to respond. (Anthony Dep. at 41, 159–60; Newlon Dep. at 167). In general, plaintiff did not provide any explanation for the problems, stating only that he had no problems with his stores. (Anthony Dep. at 42, 160). With respect to Publix # 89, plaintiff denied the charges and stated that Anthony should speak with the grocery manager. (*Id.* at 159). Plaintiff also told Anthony that he was embarrassed "to go in the stores and talk to [the managers] about a delivery not being made." (*Id.* at 42).

During the meeting, Anthony asked plaintiff, "What's [it] going to take ... to motivate you to get the job done?" (Anthony Dep. at 43). Plaintiff responded, "would you be motivated if your income was decreased 60 percent?" (Wu Dep. at 369–70, Exh. 32).[3] Anthony interpreted this comment as a statement that plaintiff was not motivated to perform his job. (*See* Anthony Dep. at 43–44).

Based on plaintiff's responses to Anthony's questions, and in particular the lack of

---

**3.** According to Anthony, plaintiff stated that "he didn't feel motivated to get up and do this every day." (Anthony Dep. at 43). Anthony also testified that plaintiff told him during the meeting that he had lost money due to the loss of accounts to bulk routes. (Anthony Dep. at 195).

motivation perceived by Anthony, Anthony made the decision to terminate plaintiff's employment. (Anthony Dep. at 44–45; Newlon Dep. at 167–68). Anthony made this decision during the meeting and did not feel the need to discuss it with Newlon, who had witnessed plaintiff's responses and statement about motivation. Anthony simply stated to Newlon during the meeting that he no longer wanted to keep plaintiff as an employee, and Newlon agreed. (Anthony Dep. at 44–45; Newlon Dep. at 167).

Sometime after the meeting with plaintiff, Anthony and Newlon prepared a separation notice for plaintiff. (*See* Newlon Dep. at 166–68, 179, Exh. 31; Anthony Dep. at 73–74, 164, Exh. 9). The handwritten notice, which is partially in Newlon's handwriting, appears to have been prepared primarily by Newlon. (*See id.*). The reasons stated in the notice for plaintiff's termination are: (1) failure to meet and communicate with the managers of all of his stores after being instructed to do so; and (2) plaintiff's stated lack of motivation. (*Id.*).

According to Anthony, Newlon did not pressure or even suggest that he terminate plaintiff. (Anthony Dep. at 45). Indeed, he felt Newlon was "neutral." (*Id.*). Newlon had not discussed plaintiff with Anthony until the complaint to DPSU, at which time Newlon merely directed Anthony to fix the problem. (*Id.* at 13, 28).

At a later time, Anthony also terminated Alex Belete's employment. (Anthony Dep. at 36; Newlon Dep. at 191–92). Belete is African–American.

In November 2001, Anthony resigned his employment with defendant at defendant's request because he had not obtained a required CDL license. (Anthony Dep. at 5).

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fairminded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## III. *DISCUSSION*

### A. *Race Discrimination*

■ Plaintiff alleges that he was discriminated against because of his race (Asian–American) with respect to (1) Newlon's failure to grant his vacation request, (2) plaintiff's demotion from Sales Supervisor to Sales Representative, (3) the number of accounts plaintiff lost during the

transition to bulk routes, and (4) plaintiff's termination from employment. Defendant presents arguments with respect to each of these claims. The only race discrimination claim addressed in plaintiff's brief in response to defendant's motion is his claim related to denial of his vacation request. Accordingly, the remaining claims are deemed abandoned. *See, e.g., Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1322 (11th Cir.2001) (finding claim abandoned where argument was not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.,* 998 F.Supp. 1473, 1477 (N.D.Ga.1998) (finding unaddressed claim abandoned).[4] The court will address only plaintiff's claim regarding Newlon's denial of his vacation request.

Title VII prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment" because of that employee's race. 42 U.S.C. § 2000e–2(a)(1). Section 1981 of Title 42 U.S.C. also prohibits employers from discriminating against individuals because of their race. 42 U.S.C. § 1981. In the employment context, the same substantive analysis applies to both statutes. *Standard v. A.B.E.L. Svcs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998); *Crawford v. Western Elec. Co.,* 745 F.2d 1373, 1376 (11th Cir.1984).

In individual disparate treatment cases under Title VII and § 1981, plaintiffs bear the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527–28 (11th Cir. 1997), *cert. denied,* 522 U.S. 1045, 118 S.Ct.

685, 139 L.Ed.2d 632 (1998). Once a prima facie case is established, a legal presumption of unlawful discrimination arises and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817. If the employer does so, the presumption is eliminated, and the plaintiff must be given an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the defendant is a pretext for discrimination. *Id.* At all times, the plaintiff retains the ultimate burden of persuading the finder of fact that the defendant acted with discriminatory intent. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

A prima facie case of race discrimination may be established either through direct evidence of discriminatory intent or, as is more often the case, through circumstantial evidence capable of supporting an inference of intentional discrimination. *See Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641–42 (11th Cir. 1998). Defendant argues, and plaintiff does not dispute, that no direct evidence of racial discrimination is present in this case.

To establish a prima face case of discrimination using circumstantial evidence, plaintiff must prove that (1) he was a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) evidence by which a finder of fact could reasonably conclude that his employer intended to discriminate on the basis of race. *See, e.g., Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575–76, 98 S.Ct.

---

4. In any event, for reasons similar to those discussed below regarding plaintiff's retaliation and FMLA claims, the court finds that summary judgment could also be granted on the merits of these claims. Plaintiff has not demonstrated that the reasons given for his demotion, loss of accounts, and termination are pretextual.

2943, 2949, 57 L.Ed.2d 957 (1978). Depending on the circumstances of the particular case, the fourth element may require a showing that plaintiff was replaced by an individual outside his protected class or that a similarly situated individual outside his protected class was treated more favorably. *See, e.g., Coutu v. Martin County Bd. of County Commr's,* 47 F.3d 1068, 1073 (11th Cir.1995); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984). "[A]n overly strict formulation of the elements of a prima facie case is to be avoided"; the main question is whether "an ordinary person could reasonably infer discrimination if the facts presented remained unrebutted." *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1556 n. 12 (11th Cir.1995).

■ Defendant first argues that denial of plaintiff's vacation request does not amount to an adverse employment action and that, for this reason, plaintiff cannot establish a prima facie case. Defendant also argues that, even if a prima facie case is established, defendant is entitled to summary judgment because plaintiff cannot demonstrate that the legitimate reason given by Newlon for the denial is pretextual. Because the court finds that plaintiff has not demonstrated pretext, the court will assume, for purposes of summary judgment, that Newlon's denial of plaintiff's request for vacation time qualifies as an adverse employment action.[5]

Defendant has presented evidence that plaintiff's vacation request was denied because Doran submitted a request at an earlier date than plaintiff for the same period of time. Plaintiff contends that this reason is pretextual because Doran in fact was plaintiff's subordinate and therefore should not have been given first choice of vacation times. (Doc. 34, Pla. Brf. at 24–25). Plaintiff notes that Newlon initially conceded during their conversation about the matter that plaintiff should have "precedence" over Doran. (Wu Dep. at 41). Plaintiff has no other evidence of discriminatory intent other than the fact that Doran is white and plaintiff is Asian.

The evidence in this case overwhelmingly supports a finding that Doran was not plaintiff's subordinate and that they in fact both reported to Newlon. The piece of paper on which plaintiff primarily relies in support of his position does not contain any substantive information; it merely lists the Sales Representatives for each territory, followed by a list of employees who worked in that territory. (*See* Newlon Dep., Exh. 42). Defendant, in contrast, has presented a job description specifically stating that Reset Supervisors report to the General Sales Manager. (Perna Aff., Exh. B). This, in combination with the testimony of Newlon, establishes beyond reasonable dispute that Reset Supervisors were not subordinate to Sales Supervisors.

Moreover, Newlon was entitled to interpret the vacation policy as he saw fit, and where, as here, his interpretation is reasonable, no inference of discriminatory intent arises. *See Nix,* 738 F.2d at 1187 ("Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules."); *Combs,* 106 F.3d at 1543 ("a plaintiff may not establish that

---

**5.** "[I]t is ... important that the threshold for what constitutes an adverse employment action not be elevated artificially, because an employer's action, to the extent that it is deemed not to rise to the level of an adverse employment action, is removed completely from any scrutiny for discrimination.... An artificially high threshold for what constitutes an adverse employment action would undermine the purposes of the statute by permitting discriminatory actions to escape scrutiny." *Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1453 n. 12 (11th Cir.1998).

an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer."). Plaintiff concedes that the absence of both the Sales Supervisor and Reset Supervisor within a single territory would be problematic and that, unlike other workers within the territory, a Reset Supervisor could fill in for him while he was gone and *vice versa*.

Finally, evidence that Newlon initially stated that plaintiff should have precedence over Doran actually cuts against plaintiff's claim of race discrimination. It tends to show that Newlon, at least initially, was not inclined to discriminate against plaintiff by giving preference to a non-Asian.

For all of these reasons, a jury could not reasonably conclude that Newlon's decision to deny plaintiff's vacation request was motivated by plaintiff's race.

## B. *Retaliation*

Plaintiff alleges that defendant retaliated against for the complaint he filed with the EEOC on October 5, 2000 by (1) excessively reducing the number of accounts in his territory during the transition to bulk routes and by (2) terminating his employment. Plaintiff, however, has abandoned his claim regarding loss of accounts by failing to respond to defendant's arguments. *See Wilkerson,* 270 F.3d at 1322. Accordingly, the court will address only plaintiff's termination claim.

■■■ Title VII prohibits employers from taking adverse employment actions against employees in retaliation for their opposition to prohibited discriminatory practices. 42 U.S.C. § 2000e–3(a); *Clover v. Total System Services, Inc.,* 157 F.3d 824, 827 (11th Cir.1998). The analytical framework set forth in *McDonnell Douglas, supra,* is used to evaluate retaliation

claims. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 919 (11th Cir.1993). To establish a claim, plaintiff must prove that he engaged in activity protected by Title VII and that he suffered an adverse employment action because of that activity. *See Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 600–601 (11th Cir.1986); *Farley v. Nationwide Mut. Ins.,* 197 F.3d 1322, 1336 (11th Cir.1999). Protected activity includes opposition to discriminatory employment practices, including race discrimination, and participation in EEOC proceedings. 42 U.S.C. §§ 2000e–2(a), 2000e–3(a). The parties do not dispute that plaintiff engaged in protected activity when he filed his EEOC charge.

■■■ Defendant presents evidence that plaintiff was terminated for poor customer service and for demonstrated lack of motivation. Plaintiff contends that these reasons are pretextual. He points to evidence of (1) the close proximity in time between his EEOC charge (October 5, 2000) and his termination (March 20, 2001); (2) the increased scrutiny to which he was subjected by O'Kelley; (3) Newlon's statement to O'Kelley that he wanted to get rid of plaintiff because he was "making trouble" by filing an EEOC charge; (4) evidence that plaintiff was in fact an excellent employee; (5) evidence that Newlon was involved in the decision to terminate plaintiff's employment, including evidence that Newlon prepared the termination notice; (6) inaccuracies in the separation notice; (7) evidence that the customer complaints listed in the separation notice are not accurate and/or do not reflect problems with plaintiff's performance; and (8) evidence that plaintiff was in fact motivated to do his job. None of this evidence, considered either singly or in combination, is sufficient to avoid summary judgment in defendant's favor.

### 1. Evidence Regarding Newlon's Intent and His Involvement in the Decision to Terminate Plaintiff

Plaintiff's strongest evidence of retaliation is Belete's averment that Newlon told O'Kelley he wanted to "get rid" of plaintiff because plaintiff was "making trouble" by filing an EEOC charge. The record contains no evidence, however, that Newlon ever made such a statement to Anthony. Indeed, Anthony denies any knowledge of the EEOC charge until plaintiff told him about it at the time of plaintiff's three-day suspension in March 2001. The probative value of Newlon's statement, therefore, depends largely on the level of Newlon's involvement in the decision to terminate plaintiff's employment. "To establish pretext, Plaintiff must show not only that [retaliatory] animus existed but that such animus tainted the ultimate decisionmaker's action." *Cooper v. Southern Co.*, 260 F.Supp.2d 1258, 1274–75 (N.D.Ga.2003)(citing *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1248 (11th Cir.1998)); *see also Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir.1999) ("When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity."), *cert. denied*, 529 U.S. 1053, 120 S.Ct. 1555, 146 L.Ed.2d 460 (2000); *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1322–23 (11th Cir.1998) (finding evidence that supervisor espoused discriminatory animus not sufficient to avoid summary judgment where another individual independently made the decision to terminate the plaintiff's employment).

Anthony testified that he alone made the decision to suspend plaintiff and merely informed Newlon of this after the fact. (Anthony Dep. at 34–35). Anthony and Newlon also testified that Anthony made the decision to terminate plaintiff's employment; Newlon merely acquiesced. (*See id.* at 44–45; Newlon Dep. at 167–68). Plaintiff's only substantive evidence to the contrary is the fact that Newlon assisted Anthony in preparing the separation notice. Both Newlon and Anthony testified that this notice was not prepared until *after* their meeting with plaintiff. (Anthony Dep. at 73–74, 164; Newlon Dep. at 166–67, 179). Newlon's after-the-fact assistance does not demonstrate that he was a participant in the decision, or that he influenced Anthony to make that decision.

Moreover, even if Newlon had encouraged Anthony to terminate plaintiff, the evidence overwhelmingly demonstrates that Anthony would have made the same decision regardless of Newlon's involvement. To prevail, plaintiff would have to "prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." *Stimpson*, 186 F.3d at 1331.

> One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the "cat's paw" theory. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus.

*Id.* at 1332. As in *Stimpson*, plaintiff has not produced any evidence that Anthony acted merely as Newlon's "cat's paw." Indeed, the evidence demonstrates that Anthony conducted an independent investigation of plaintiff's performance and made his own decisions regarding discipline.

For this reason, the court finds Newlon's alleged retaliatory statement to be of little probative value.

### 2. *Close Temporal Proximity*

Plaintiff was terminated five and one-half months after he filed his EEOC charge. In some situations, temporal proximity can, by itself, create an inference of causation. *See Brungart v. Bell-South Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir.2000), *cert. denied*, 532 U.S. 1037, 121 S.Ct. 1998, 149 L.Ed.2d 1001 (2001); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993); *Donnellon*, 794 F.2d at 600–01. Courts have found, however, a time-span of similar length insufficient. *See Wascura v. City of South Miami* 257 F.3d 1238, 1245 (11th Cir.2001)(finding a three-and-one-half month time lag between protected activity and alleged retaliation, standing alone, insufficient for a finding of causation); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (four-month period insufficient); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (three-month period insufficient). Moreover, any inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established. *See Robinson v. AFA Serv. Corp.*, 870 F.Supp. 1077, 1084 (N.D.Ga.1994) (finding absence of causal link, despite termination one day after employer learned of plaintiff's discrimination charge, where plaintiff had been warned numerous times regarding her job performance); *Gleason v. Mesirow Financial*, 118 F.3d 1134, 1147 (7th Cir.1997)(finding termination only a few weeks after the plaintiff complained insufficient to establish a causal link where discharge closely followed a "significant and costly error"); *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346 (8th Cir.), *cert. denied*, 519 U.S. 813, 117 S.Ct. 61, 136 L.Ed.2d 23 (1996) (finding no inference of causation where there was "considerable evidence" that supervisors reprimanded the plaintiff several times and gave him a final warning about his job status before they knew of his discrimination complaints); *Booth v. Birmingham News Co.*, 704 F.Supp. 213, 215–16 (N.D.Ala.1988) (holding that a short span of time created no reasonable inference of retaliation where the record contained "intervening factors," *i.e.*, other reasons for the adverse action arising after the protected activity), *aff'd without op.*, 864 F.2d 793 (11th Cir.1988).

In this case, during the time between plaintiff's EEOC and his termination, Anthony became plaintiff's supervisor and began to receive numerous complaints from plaintiff's customers, including one complaint that reached defendant's parent company, DPSU. As a result, Anthony, who at the time had no knowledge of plaintiff's EEOC charge, made the decision to suspend plaintiff. During plaintiff's suspension, Anthony discovered numerous other problems with plaintiff's accounts. As a result of these problems and Anthony's perception that plaintiff lacked motivation to improve, Anthony (who by this time knew of plaintiff's EEOC charge) made the decision to terminate plaintiff's employment. In addition, defendant has presented evidence that plaintiff was disciplined by a previous supervisor in June 2000, well before plaintiff filed his EEOC charge, for similar problems. (*See* Perna Aff., Exh. E). Given this evidence, a reasonable juror could not draw an inference of causation from the proximity in time between plaintiff's EEOC charge and his termination.

### 3. *Increased Scrutiny of Plaintiff's Work*

Plaintiff contends that the increased scrutiny to which he was subjected, particularly by O'Kelley, after he filed his

EEOC charge constitutes further evidence in support of his claim. In *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524–25 (11th Cir.1991), on which plaintiff partially relies, the Court of Appeals for the Eleventh Circuit recognized that increased scrutiny of one's work after an EEOC charge can constitute evidence of intent to retaliate. In that case, "intensive monitoring" of the plaintiff's performance was instituted, "in which at least one management employee was assigned to keep track of [the employee's] work schedule and expense reports and regularly write memos to his personnel file." *Weaver*, 922 F.2d at 1525.

The increased scrutiny to which plaintiff was subjected by O'Kelley was not nearly as severe as that discussed in *Weaver*. O'Kelley simply kept a file of complaints he received regarding plaintiff's performance. The record contains no evidence that O'Kelley solicited complaints or otherwise increased his scrutiny of plaintiff's work. There is also no evidence that anyone instructed O'Kelley to maintain the complaint file. Furthermore, O'Kelley testified that he maintained the file out of fear that plaintiff would bring a lawsuit; this does not demonstrate that O'Kelley intended to retaliate against plaintiff, but merely that he wished to protect himself from possible attack. Finally, and most importantly, Anthony, rather than O'Kelley, made the decision to terminate plaintiff based on his own observations of plaintiff's performance and lack of motivation; he did not rely on O'Kelley's file. Thus, even if O'Kelley had acted with a retaliatory motive, the record contains no evidence that O'Kelley influenced Anthony's decision in any meaningful way. *Cf. Weaver*, 922 F.2d at 1526 (finding evidence to support finding that supervisors, who engaged in increased scrutiny of the plaintiff but had not made the termination decision, had influenced the decisionmaker); *Stimpson*, 186 F.3d at 1331–32 (finding that, under "cat's paw" theory, "causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee").

### 4. Evidence Regarding Plaintiff's Performance as an Employee and His Motivation

Plaintiff presents evidence that he was in fact an excellent employee and was motivated to perform his job. Three former co-workers all aver that plaintiff performed well on the job. (Doc. 35, White Decl., Turk Decl., Belete Decl.). None of this evidence, including plaintiff's own evaluation of his performance, is sufficient to support a finding of pretext. "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)(evidence that employee was fired based on employer's belief that he had engaged in misconduct not rebutted by evidence that employee in fact had not done so); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332–33 (11th Cir.1998)(finding that the plaintiff's own evaluation of his qualifications does not support a finding of pretext).

Anthony testified about his own personal observations of stores in plaintiff's territory, as well as information he had received from Rodriquez, which he believed to be accurate. In most instances, plaintiff does not deny that problems existed in these stores; instead, he contends that problems were due solely to missed deliveries. When asked about this, Anthony

testified that he did not think missed deliveries were the problem because he had not received any complaints, from plaintiff or the store managers, about delivery problems at the stores he had visited. (*See* Anthony Dep. at 40). Anthony also questioned several of the store managers about the cause of their problems, many of whom laid the blame on the Sales Representative. Plaintiff's general contention that he complained to Anthony and others about delivery problems—especially in light of evidence that he made numerous written complaints in the summer of 2000, but only one thereafter—is not sufficient for a jury to conclude that Anthony in fact believed the problems, which occurred in 2001, were the result of delivery deficiencies. Given the available evidence, a reasonable juror could only conclude that Anthony *believed* plaintiff was responsible for many of the problems he observed, even if plaintiff in fact was not.

### 5. *Inaccuracies in the Separation Notice*

Finally, plaintiff points to inaccuracies in the separation notice as evidence of pretext. (Doc. 34, Pla. Brf. at 12–13). This argument is frivolous. The notice provides a partial list of stores where problems were found and associates dates with these problems. (*See* Anthony Dep., Exh. 9). Six of the entries list dates when plaintiff was on suspension. Anthony testified, however, these are the dates he discovered the listed problems and/or spoke with the customer about the complaint. (Anthony Dep. at 73–76).

For all of these reasons, the court finds that summary judgment should be entered on plaintiff's retaliation claim.

### C. *Family and Medical Leave Act*

■ Plaintiff's final claim alleges a violation of the FMLA. Under the FMLA, an eligible employee is "entitled to a total of 12 workweeks of leave during any 12–month period ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" includes "an illness, injury, impairment, or physical or mental condition that involves ... continuing treatment by a health care provider." 29 U.S.C. § 2611(11).[6] "[N]ot all leave requested or taken for medical reasons qualifies for the FMLA's protections. For this reason, employers have a statutory right to require an employee requesting FMLA leave to obtain certification that attests to the employee's eligibility for such leave from a health care provider." *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir.2000); *see also* 29 U.S.C. § 2613(a). Leave need not be taken as a 12–week block, but may be taken "intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. § 2612(b)(1).

■ "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employ-

---

**6.** "A serious health condition involving continuing treatment by a health care provider includes ... [a] period of incapacity ... of more than three consecutive calendar days ... that also involves: (A) Treatment two or more times by a health care provider, ... or (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.114(a)(2).

ee asserts that his employer discriminated against him because he engaged in activity protected by the Act, *see* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c)." *Wascura v. City of S. Miami*, 257 F.3d 1238, 1247–1248 (11th Cir. 2001) (*citing Strickland v. Water Works and Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir.2001)). Plaintiff contends that he has both an interference and a retaliation claim, but the only harm about which he complains (with respect to the FMLA) is his demotion upon returning from sick leave in April 2000. (*See* Doc. 34, Pla. Brf. at 18–23). The retaliation provision of the FMLA states: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220. Plaintiff has not alleged that he complained about any practice prohibited by the FMLA *before* his demotion. Accordingly, the court finds that plaintiff in fact has only one FMLA claim and that claim falls under the interference provision, which states: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). *See Strickland*, 239 F.3d at 1206–08 (finding that employee did not have a retaliation claim where he had been discharged after leaving work; employee had told supervisor that he was ill, but had not specifically invoked the FMLA).

To state an interference claim under the FMLA, "a plaintiff need only demonstrate that he was entitled to but denied [an FMLA protected] right. He does not have to allege that his employer intended to deny the right; the employer's motives [in contrast to a retaliation claim] are irrelevant." *Strickland*, 239 F.3d at 1208. Plaintiff contends that he was entitled to, but denied, the right to reinstate-

ment upon return from his sick leave. Before an employee is entitled to FMLA protection, however, he must provide notice to his employer of the need for FMLA leave. *See* 29 U.S.C. § 2612(e); 29 C.F.R. § 825.303; *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir.1997); *Satterfield v. Wal–Mart Stores, Inc.*, 135 F.3d 973, 980–81 (5th Cir.), *cert. denied*, 525 U.S. 826, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998); *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir.1997). Defendant argues that plaintiff failed to provide adequate notice and that, even if notice had been provided, plaintiff would not be entitled to reinstatement because of his poor job performance. The court finds that defendant is correct with respect to reinstatement and, therefore, will not address defendant's argument regarding notice.

The FMLA states that any eligible employee who takes leave under the statute "shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position . . . ." 29 U.S.C. § 2614(a)(1). An employee need not be restored, however, to "any . . . position of employment other than any . . . position to which the employee would have been entitled had the employee not taken leave." 29 U.S.C. § 2614(a)(3); *see also* 29 C.F.R. 825.216. Thus, "if any employer can show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable." *Strickland*, 239 F.3d at 1208.

Defendant has presented evidence that factors unrelated to plaintiff's request for leave resulted in the decision to demote him from the position of Sales Supervisor to Sales Representative. Plaintiff took sick leave during the week he had requested for vacation and then failed to respond to Newlon's numerous attempts to contact

him via telephone and a visit to plaintiff's home. Given this, Newlon could have reasonably concluded that plaintiff was feigning illness. Whether in fact plaintiff was feigning illness is beside the point; only Newlon's subjective beliefs are probative of his intent. *See Kariotis v. Navistar Intern. Transp. Corp.*, 131 F.3d 672, 680–81 (7th Cir.1997) (finding that employee could be terminated under the FMLA for suspected fraudulent use of sick leave even if fraud had in fact not occurred; employer "need not conclusively prove that [employee] had misused her leave; an honest suspicion will do"); *Moughari v. Publix Super Markets, Inc.*, 1998 WL 307454, *2 (N.D.Fla.1998) (finding no violation of the FMLA where undisputed evidence established that the employer terminated employee based on conclusion that employee was not using his leave time for its intended purpose and was not being candid with his managers about his leave, even if in fact no misuse occurred), *aff'd without published opinion*, 170 F.3d 188 (11th Cir. 1999).

Moreover, during plaintiff's absence, Newlon discovered that plaintiff had not adequately prepared (in Newlon's opinion) for a customer's grand opening. Newlon also learned that some of the customers in plaintiff's territory did not know plaintiff's name, that plaintiff had not performed a task he had asked plaintiff to perform weeks earlier, and that one customer had been trying unsuccessfully to get service for three weeks. This evidence supports a finding that Newlon also demoted plaintiff based on deficiencies he perceived in plaintiff's work performance. Plaintiff's evidence that Newlon was mistaken about plaintiff's work performance and about his illness simply does not support a finding that Newlon's suspicions were not honest and that he in fact demoted plaintiff for his legitimate use of sick leave.

Finally, the fact that plaintiff's leave is what permitted Newlon to discover the problems with plaintiff's work performance is of no consequence. Although one could say that plaintiff might not have been demoted if he had not taken leave (at least not at that time), the leave was not the proximate cause of the demotion. Under the FMLA implementing regulations, plaintiff has "no greater right to reinstatement or to other benefits and conditions of employment than if [he] had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). Given that defendant could have demoted plaintiff for poor job performance discovered while he was on duty, defendant can also demote plaintiff for poor job performance discovered while plaintiff was on leave. *See Kariotis*, 131 F.3d at 681. Otherwise, plaintiff would enjoy a "greater right" to continued employment that if he been continuously employed during his FMLA leave. *See id. See also Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 802–06 (7th Cir.2001) (finding no violation of the FMLA where employee was terminated upon return from maternity leave for poor job performance and improper handling of funds, much of which was discovered during the employee's absence; "The fact that the leave permitted the employer to discover the problems can not logically be a bar to the employer's ability to fire the deficient employee.").

Accordingly, the court finds that summary judgment should be granted on plaintiff's FMLA claim.

## IV. CONCLUSION

For the reasons stated, the undersigned **RECOMMENDS** that defendant's Motion for Summary Judgment [Doc. 29] be **GRANTED** and that this action be **DISMISSED with prejudice.** Plaintiff's Motion to Extend Discovery [Doc. 15], defen-

dant's Motion to Compel [Doc. 16], and plaintiff's Motion to Compel [Doc. 18] are all are **DENIED as moot.** Defendant's Unopposed Motion to Extend Time to File Motion for Summary Judgment and to Extend Page Limitation [Doc. 19] is **GRANTED nunc pro tunc.**

Dated Aug. 13, 2003.